# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 22, 2014 Session

## STATE OF TENNESSEE v. TRAVIS GROVER RICHARDSON

**Appeal from the Criminal Court for Carter County**
**No. 21401      Jon Kerry Blackwood, Judge**

---

**No. E2013-02250-CCA-R3-CD - Filed October 10. 2014**

---

Defendant, Travis Grover Richardson, was convicted by a Carter County jury of aggravated robbery, two counts of felony evading arrest, two counts of felony aggravated assault, criminal simulation, and felony reckless endangerment. Following a sentencing hearing, the trial court ordered Defendant to serve a total effective sentence of thirty years' incarceration. In this direct appeal, Defendant contends: (1) that he was improperly convicted of felony reckless endangerment as a lesser-included offense of attempted second degree murder; (2) that his two convictions for felony evading arrest violated his right to be free from double jeopardy; (3) that the evidence was insufficient to support his conviction for aggravated robbery and both of his convictions for aggravated assault; and (4) that he was improperly sentenced as a career offender based, in part, on offenses he committed as a juvenile. Upon our thorough review of the record and applicable law, we reverse Defendant's conviction of felony reckless endangerment and merge Defendant's two convictions for felony evading arrest into a single conviction. We affirm the remaining judgments of the trial court and remand for correction of the judgment forms.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part; Reversed in Part; and Remanded.**

TIMOTHY L. EASTER, SP. J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

James T. Bowman, Johnson City, Tennessee, for the appellant, Travis Grover Richardson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Tony Clark, District Attorney General; and Janet Hardin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural Background*

A Carter County Grand Jury indicted Defendant on one count of aggravated robbery, four counts of aggravated assault, one count of theft of property valued at $1,000 or more, two counts of felony evading arrest, two counts of criminal simulation, two counts of attempted second degree murder, and one count of vandalism. On May 13, 2013, Defendant proceeded to a jury trial.

Brittany Rice testified at the jury trial that she worked at a grocery store in Carter County ("the store") in August, 2011. Rice met Defendant while she was working as a cashier at the store approximately four or five days prior to the day of the events in question. Shortly after meeting Rice, Defendant asked her to exchange "fake counterfeit money for real money." Rice testified that she agreed to make the exchange because she was "too afraid" to say no. On August 2, 2011, prior to the time Defendant was supposed to come in and make the exchange, Rice told the store's manager, Richard Teeter, about Defendant's plan, and Teeter informed police. Three police officers and Teeter hid out of sight while Defendant entered the store and gave Rice a $100 bill. At that moment, Rice gave a signal over the store's intercom system, and the officers and Teeter approached Defendant. Rice testified that one of the officers "asked [Defendant] to go to the side," and then things went "haywire." Defendant became "aggressive" and "tried to push the cops away from him and tried to run." Rice described a struggle in which Defendant struck Teeter and eventually ran out of the store. On cross-examination, Rice explained that, in exiting the store, Defendant ran straight through a sliding door, knocking it off its hinges.

Officer Matthew Taylor, a police officer with the Elizabethton Police Department ("EPD") testified that he responded to the store on August 2, 2011. As Defendant left the register, Officer Taylor stood behind him. When Defendant turned around, Officer Taylor asked Defendant to "speak with [him] a minute." Defendant responded, "[W]hat's this about?" Officer Taylor grabbed Defendant's arm, and "that's when the struggle ensued." Officer Taylor testified that he grabbed Defendant's arm because Defendant "was beginning to walk backwards away from [him] and it appeared to [him] that [Defendant] was either going to fight or try to flee." Officer Taylor described what happened next:

> [Defendant] began to fight. . . He broke loose of my grip. One of the managers had grabbed him, took him to the floor. We began to wrestle. I told him put your hands behind your back, you're under arrest. He refused to do so. I then stood up and tried to deploy my taser to subdue him. And

-2-

the way a taser works both probes have to hit your target and only one probe hit the target which renders it useless. He then ran out the front door, broke the front doors and ran.

Officer Taylor identified a video taken by a surveillance camera at the store which depicted the struggle testified to above, and the video was entered into evidence without objection. Officer Taylor also identified a video recorded from his taser gun during the incident in which he tried and failed to subdue Defendant with his taser gun, and the video was entered into evidence without objection.[1]

Once outside the store, Officer Taylor continued to chase Defendant. When Defendant reached "a set of kind of dumpsters," Defendant turned around and said, "[C]ome on, motherfucker." Defendant "pulled a silver knife out of his pocket and began swinging it side to side." Officer Taylor testified that Defendant came "within six to twelve inches" of Officer Taylor's chest with the knife. At the time Defendant came at him with the knife, Officer Taylor testified, "I thought he was going to take my life. I thought he was going to kill me." At that point, Officer Taylor drew his gun and aimed it at Defendant. Defendant turned and ran through a ditch, and Officer Taylor continued to pursue him on foot. Officer Taylor testified:

> [Defendant] then runs into a driveway where there is a gentleman standing. I – the gentleman starts running towards [Defendant] I guess in an event to help me subdue him. [Defendant] then takes the knife and starts swinging it at the gentlemen. I scream to him to get back [Defendant has] got a knife. At this point I was probably twenty-five yards away I would imagine, twenty yards away.

At that point, Defendant entered a white Jeep parked in the driveway and drove into the street, striking another officer's vehicle. Defendant then reversed the Jeep towards Officer Taylor, causing Officer Taylor to jump into a ditch to avoid the Jeep. Officer Taylor testified that he perceived Defendant to be intentionally trying to strike him with the Jeep, and Defendant screamed, "I'll kill you, mother-fucker." After Officer Taylor dove into the ditch, Defendant drove away in the Jeep. Officer Taylor returned to his police vehicle and began to chase the Jeep. By that time, there were several other officers in front of him also pursuing Defendant. Eventually, Officer Taylor broke off his pursuit.

On cross-examination, Officer Taylor admitted that he was not aware of the signal Rice gave over the intercom system. He arrived just as the transaction was taking place. He clarified that Defendant's knife was a "small silver folding knife."

---

[1]Officer Taylor explained that the video recording equipment is installed inside the taser gun and begins recording from the moment the taser is activated until the time that the taser is holstered.

-3-

Officer Eric Buck, a police officer with the EPD, testified that he received a call on August 2, 2011, to respond to the store and "assist Patrolman Taylor in a foot chase." When he arrived, he saw Defendant and Officer Taylor in a nearby parking lot engaged in "some sort of altercation, struggle." As Officer Buck made his way toward the parking lot, Defendant began to run from Officer Taylor again, and Officer Buck saw Defendant run toward a house. As Officer Buck approached the house, he saw Defendant engaged in a "physical altercation" with a man at the house. Officer Buck parked his patrol vehicle in the driveway, blocking a white Jeep that was parked there. As Officer Buck was exiting his patrol car, Defendant already had entered the Jeep. Officer Buck approached the Jeep. He testified, "As I was walking up to the [Jeep,] I observed [Defendant] with a knife in his left hand. [Defendant] immediately put the vehicle in reverse, rapidly sped up backwards and crashed into my patrol car."

When Defendant backed into Officer Buck's patrol car, the Jeep became "hung up" on his patrol car. At that point, Officer Buck fired his taser at Defendant, but he missed. A video recorded from Officer Buck's taser gun was entered into evidence without objection. After a few seconds, the Jeep broke free from his patrol car, and Defendant sped away.

Mike Hicks testified that, on August 2, 2011, while he was outside cleaning his pool, he saw "an altercation across the street in a parking lot between an officer and [Defendant]." Hicks testified that Defendant began running directly toward his house with a police officer chasing him. Because he was afraid that Defendant was going to attempt to enter his house, Hicks ran to cut off Defendant. Hicks testified, "I got in front of him as he was coming in the driveway and he stuck out a knife and told me to give him my keys." At about that time, Officer Buck pulled his patrol car into the driveway. Hicks testified that his Jeep was parked in the driveway and that he had left the keys in the ignition. When Hicks told Defendant that he did not have any keys on him, Defendant jumped into his Jeep and, finding the keys in the ignition, started the Jeep and backed into Officer Buck's patrol car. Defendant "just floored it and pushed [Officer Buck's patrol car] out of the way until he could clear him," and then drove away.

On cross-examination, Hicks testified that he recalled seeing two officers with Defendant in the parking lot. He testified that one of the officers "grabbed [Defendant], and tugged on him and – he swung around like they were fighting." He confirmed that he did not tell Defendant that the keys were in his Jeep.

Captain Joy Markland, a police officer with the EPD, testified that she responded to the call of the pursuit of Defendant. As she drove toward the store, she spotted the white Jeep traveling on the same road in the opposite direction, approaching her. Captain Markland testified, "As I was slowing and stopped I notice[d] that this Jeep who I

perceived to be the suspect vehicle appeared to accelerate and travel into my lane of travel." As a result, Captain Markland was forced to "take actions to avoid a head-on collision," driving off the road. She testified that her blue lights were on at the time of the near-collision. Subsequently, Captain Markland turned around and began to pursue the Jeep. At one point during the pursuit, Captain Markland remembered Defendant "slamming on his brakes," forcing her to do the same. Several other officers joined the pursuit. At some point during the pursuit, Captain Markland "began losing brake function" and was almost out of fuel, so she discontinued her pursuit. She testified that, throughout the pursuit, Defendant disregarded all traffic signs, stop signs, and traffic lights. She pursued Defendant for a total of approximately eleven miles before terminating her pursuit. She testified that she subsequently drove the entire route of the pursuit and determined the length of the entire pursuit to have been twenty-five miles. Captain Markland identified Defendant as the driver of the white Jeep. Captain Markland identified a video of the pursuit recorded from her patrol car, and the video was entered into evidence.

Lieutenant Penny Cornett, an officer with the Carter County Sheriff's Office, received a call to aid in the pursuit of Defendant. She joined the pursuit as it was already in progress. She testified that, at one point during the pursuit, "[t]he white Jeep stopped in front of me. I stopped behind him. The white Jeep put his vehicle in reverse and rammed into my vehicle." After the collision, Defendant sped off, and the pursuit resumed. Lieutenant Cornett identified a video of the pursuit recorded from her patrol car, and the video was entered into evidence. Throughout the pursuit, Defendant drove "erratically" and ignored the traffic laws. Eventually, Lieutenant Cornett performed a "pit maneuver" in which she struck Defendant's rear, passenger-side bumper, causing the Jeep to spin out of control and come to a stop. After the Jeep came to a stop, Lieutenant Cornett exited her vehicle and approached Defendant. When she approached the Jeep, she saw Defendant in the driver's seat with "one hand down [and] one hand up." Defendant refused to comply with her command to exit the vehicle and began to roll up his window. At that point, Lieutenant Cornett fired her taser gun at Defendant, striking him. Another officer was able to remove Defendant from the vehicle, and Defendant was placed under arrest.

Officer Taylor was re-called and testified that, after Defendant was apprehended successfully, he was called to transport Defendant to booking. Upon placing Defendant in his patrol car, Officer Taylor searched him. This search did not uncover a knife.

Todd Hamm, an Investigator with the EPD, testified that he had roughly ten years of experience investigating forgery, counterfeiting, and fraud cases. As part of his investigation in this case, Investigator Hamm examined two one-hundred dollar bills. One of the bills was the bill that had been passed by Defendant to Rice and was recovered from the store. The other bill was recovered during a search of Defendant following his

arrest.  Regarding the bills, he testified:

> The paper is not right.  The special paper the mint uses that actually has a certain feel to it.  I mean, you know money when you feel it, and it also has blue and red threads woven within the paper and none of that is present here.  There's one spot where it appears the bill got wet and the ink is running.  That doesn't happen on a real bill.  And there's several other security features that . . . aren't present on this copy such as the water mark that's present when you hold it up to the light.  There is a security strip that's woven within the paper. That's also not present.  And . . . the number 100 on the bills on an actual bill they are colored in a certain way where they appear black, and if you tilt the bill they turn green.  None of that is also present.

Investigator Hamm confirmed that both bills shared all of the characteristics he identified. He also noted that both bills shared the same serial number, which would not happen if the bills were genuine.  Based on all of those observations, Investigator Hamm concluded that, in his opinion, both of the bills were counterfeit.  Both bills were entered into evidence without objection.

Following Investigator Hamm's testimony, the State rested its case-in-chief.  The Defense moved for a judgment of acquittal on count two of the indictment charging aggravated assault on Officer Buck, and the trial court granted the motion.  The Defense made a motion to dismiss one of the felony evading arrest charges contained in counts four and six of the indictment on the grounds that they both arose out of a "continued chase" and therefore constituted one offense.  The trial court denied the motion, reasoning, "[T]he proof is that [Captain] Markland initially put the – put her emergency lights on first and then [Lieutenant] Cornett continued – [Lieutenant] Cornett came later and put the – her blue lights on.  So, I think Counts 4 and 6 can be construed as two separate events of evading arrest."  The Defense also moved for a judgment of acquittal regarding counts eight and nine of the indictment, charging criminal simulation.  The trial court merged counts eight and nine into one count of criminal simulation.

Defendant chose to testify on his own behalf.  According to Defendant, when Officer Taylor approached him from behind at the store, Defendant "tried to get away from him."  When asked why he tried to get away from Officer Taylor, Defendant responded, "[Be]cause I was afraid I was going to jail."  When he left the store, Defendant turned right, which was the opposite direction of where his car was parked. Determining that he needed to make his way back to his car, Defendant "stopped and tried to turn around."  When he did that, Defendant explained, "[T]he officer had pulled his gun and was pointing it at me telling me to get on the ground, to stop."  Defendant denied that he had a knife.  When he saw the gun, he turned and continued running in the

same direction as he originally was headed. While he was running from the officers, Defendant testified, "A guy come out coming toward me and he appeared to be wanting to assist the officers and he come like he was going to grab me." He denied showing the man a knife or demanding his keys. According to Defendant, he "put up [his] fists in defense." As Defendant was "backing away" from the man, he saw the Jeep and "noticed the keys were in the ignition," so he decided to take it. After he got into the Jeep, Defendant noticed that "another officer had come sliding into the driveway behind [him]," blocking his way onto the street. Defendant backed into the patrol car, "slid around a bit and broke loose" before driving away.

Defendant denied that he tried to hit Captain Markland as she approached traveling in the opposite direction. He testified, "I never seen [sic] her vehicle. I was looking back over my shoulder trying to see where the officers were behind me." Regarding the collision with Lieutenant Cornett, Defendant admitted that he "put the car in reverse and backed into [Lieutenant Cornett's] cruiser." He explained, "I had this idea that I thought that if I backed into the cruiser that it would deploy the airbags and that that cruiser would no longer be able to follow me." Defendant stated that he did not have a knife during the incident. When asked why he fled police, Defendant responded, "I was just trying to get away."

On cross-examination, Defendant speculated that Hicks and Officer Taylor must have been "mistaken" when they thought they saw him with a knife. He denied that he ever saw Captain Markland approaching him. However, when asked about the video, he agreed, "[I]t showed – plainly shows that I crossed the center line." He agreed that, had Lieutenant Markland not driven off the road to avoid him, there would have been a head-on collision. He agreed that he created a danger to others by fleeing the police in the Jeep. He admitted that, throughout the pursuit, he drove over the center line into the opposite lane, broke the speed limit, failed to stop at stop signs, and had to swerve to avoid other motorists as well as a pedestrian. When asked about a moment in the video when he gestured out the window of the Jeep with his hand during the pursuit, Defendant explained that he knew the people in the passing truck and that he was "waving at them." Defendant testified that, at one point during the pursuit, a vehicle in front of him "slowed down," so he "bumped him." He agreed that he disregarded "[a] good many" traffic lights he encountered during the pursuit. When asked, "And you had absolutely no regard for the human beings on that road other than your life?" Defendant responded, "No, ma'am."

After Defendant's testimony, the defense rested its proof. The jury deliberated and found Defendant guilty of aggravated robbery, two counts of felony evading arrest, two counts of felony aggravated assault, and criminal simulation. The jury also found Defendant guilty of felony reckless endangerment as a lesser-included offense of attempted second degree murder. At a subsequent sentencing hearing, the trial court

sentenced Defendant as a career offender to thirty years on the aggravated robbery conviction, twelve years on each of the two felony evading arrest convictions, fifteen years on each of the two aggravated assault convictions, six years on the felony reckless endangerment conviction, and six years on the criminal simulation conviction.[2] The trial court ordered all sentences to run concurrently with the aggravated robbery sentence. Defendant filed a motion for new trial, which the trial court denied. Defendant then filed a timely notice of appeal.

*Analysis*

In this direct appeal, Defendant raises the following issues: (1) whether he was improperly convicted of felony reckless endangerment as a lesser-included offense of attempted second degree murder; (2) whether his convictions for two counts of felony evading arrest violated his right to be free from double jeopardy; (3) whether the evidence was insufficient to support his conviction for aggravated robbery and both of his convictions for aggravated assault; and (4) whether he was sentenced improperly as a career offender based, in part, on offenses he committed as a juvenile. We will consider each of these issues in turn.

*I. Reckless Endangerment Conviction*

Defendant argues that the trial court erred in charging the jury with the offense of felony reckless endangerment as a lesser-included offense of attempted second degree murder. The State agrees.

Whether a given offense should have been submitted to the jury as a lesser-included offense is an issue involving a mixed question of law and fact. Thus, our review is de novo with no presumption of correctness. *See State v. Moore*, 77 S.W.3d 132, 134 (Tenn. 2002); *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001).

Both the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution guarantee a criminal defendant's right to fair and reasonable notice of the charges to be defended. *Rush*, 50 S.W.3d at 428. Therefore, "the accused may be convicted only of a crime which is raised by the indictment or which is a lesser-included offense thereof." *Id.* (citing *Hagner v. United States*, 285 U.S. 427, 431 (1932)). Tennessee Rule of Criminal Procedure 31(d) defines a lesser-included offense as either "an offense necessarily included in the offense charged" or "an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." Tenn. R. Crim. P. 31(d). The trial court "has a duty to instruct the jury 'on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support

---

[2] The record indicates that the charges for theft of property, vandalism, one count of attempted second degree murder and one count of aggravated assault were all dismissed prior to trial.

conviction for the lesser offense.'" *Id.* (quoting *State v. Langford*, 994 S.W.2d 126, 128 (Tenn. 1999)).

Tennessee Code Annotated section 40-18-110 provides the following definition of lesser included offense:

> (f) An offense is a lesser included offense if:
>
> (1) All of its statutory elements are included within the statutory elements of the offense charged;
>
> (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);
>
> (3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or
>
> (4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

T.C.A. § 40-18-110(f). The statute also defines specific crimes as lesser included offenses of other crimes, such as voluntary manslaughter is a lesser included offense of both premeditated first degree murder and second degree murder. *See* T.C.A. § 40-18-110(g).

Defendant was indicted for the attempted second degree murder of Officer Buck. Second degree murder is defined in pertinent part as "[a] knowing killing of another." T.C.A. § 39-13-210(a) (1) (2010). Reckless endangerment with a deadly weapon is defined as reckless "conduct that places or may place another person in imminent danger of death or serious bodily injury" that is "committed with a deadly weapon." *Id.* § 39-13-103(a), (b) (2010). Under Tennessee Code Annotated section 40-18-110(f)(1), reckless endangerment cannot be a lesser-included offense of attempted second degree murder because reckless endangerment requires proof of the use of a deadly weapon, an element not required to prove attempted second degree murder. Furthermore, reckless endangerment is not listed as a lesser included offense of second degree murder under Tennessee Code Annotated section 40-18-110(g). As such, felony reckless endangerment is not a lesser-included offense of attempted second degree murder.

This finding is consistent with the explicit holding of our supreme court. *See*

*Rush*, 50 S.W.3d at 431 ("[F]elony reckless endangerment is not a lesser-included offense of attempted second degree murder."). Therefore, the trial court erred when it instructed the jury on felony reckless endangerment as a lesser-included offense of attempted second degree murder. Accordingly, Defendant's conviction for felony reckless endangerment with a deadly weapon must be reversed. Because the jury already has rejected the charge of attempted second degree murder, Defendant cannot be retried for that offense. *See Moore*, 77 S.W.3d 136. Therefore, we remand this case for a new trial on all offenses which qualify under Tennessee Code Annotated sections 40-18-110(f) or (g) as lesser-included offenses of attempted second degree murder.[3] *See id.*; *Rush*, 50 S.W.3d at 432.

## II. Evading Arrest Convictions

Defendant next contends that his convictions for two counts of felony evading arrest violated his right to be free from double jeopardy. The State agrees. "Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." *State v. Watkins*, 362 S.W.3d 530, 539 (Tenn. 2012) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

The Fifth Amendment to the United States Constitution and Article 1, section 10 of the Tennessee Constitution provide that no criminal defendant shall be "twice put in jeopardy of life or limb" for the same offense. This protection against double jeopardy encompasses "unit-of-prosecution" claims which "arise when defendants who have been convicted of multiple violations of the *same* statute assert that the multiple convictions are for the 'same offense.'" *Watkins*, 362 S.W.3d at 543 (emphasis in original). In addressing such a claim, this Court must determine "what the legislation intended to be a single unit of conduct for purposes of a single conviction and punishment." *Id.* (citation and internal quotation marks omitted); *see also State v. Glover P. Smith*, ___ S.W.3d ___, ___, No. M2011-00440-SC-R11-CD, 2014 WL 2766674, at *12 (Tenn. June 19, 2014). The first step in determining the unit of prosecution is to "examine the statute in question to determine if the statutory unit of prosecution has been expressly identified." *Glover P. Smith*, 2014 WL 2766674, at *12. We must next review the legislative history of the statute. *Id.* Where there is any ambiguity in defining the unit of prosecution, we must apply the "rule of lenity," and that ambiguity must be decided against allowing multiple prosecutions. *Glover P. Smith*, 2014 WL 2766674, at *12; *Watkins*, 362 S.W.3d at 543; *State v. Lewis*, 958 S.W.2d 736, 739 (Tenn. 1997). Finally, we must perform a "factual analysis as to the unit of prosecution." *Id.* When discrete acts have been committed, multiple punishments for the same offense do not violate double jeopardy. *Watkins*, 362 S.W.3d at 556.

---

[3]This includes misdemeanor reckless endangerment as it was a lesser offense charged originally and was never rejected by the jury.

Tennessee Code Annotated section 39-16-603(b)(1) (2010) states: "It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Any such attempt to elude law enforcement which "creates a risk of death or injury to innocent bystanders or other third parties . . . is a Class D felony." *Id.* § 39-16-603(b)(3).

Panels of this Court have previously held that dual convictions for felony evading arrest and misdemeanor evading arrest violate double jeopardy principles when the dual convictions are premised on the ground that one portion of a police pursuit was on foot and another portion was by motor vehicle. *See State v. William Keith Paulson*, No. E2007-02621-CCA-R3-CD, 2009 WL 3047004, at *6-8 (Tenn. Crim. App. Sep. 4, 2009); *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *7 (Tenn. Crim. App. Aug. 25, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006); *State v. Prentice C. Calloway*, No. M2004-01118-CCA-R2-CD, 2005 WL 1307800, at *6-8 (Tenn. Crim. App. June 2, 2005). In each of those cases, this Court held that the pursuit constituted one "continuous criminal episode rather than two discrete acts supporting multiple convictions," even when the pursuit was partially by foot and partially by motor vehicle. *William Keith Paulson*, 2005 WL 1307800, at *7; *Gregory Mullins*, 2005 WL 2045151, at *7 ("[T]he case giving rise to both offenses was one continuous criminal episode rather than two discrete acts capable of supporting multiple convictions."); *Prentice C. Calloway*, 2005 WL 1307800, at *7. Similarly, this Court has held that dual convictions for felony evading arrest and misdemeanor evading arrest violate double jeopardy principles when those convictions were based on Defendant's fleeing in one vehicle and transferring to another vehicle mid-pursuit. *State v. Timothy Dewayne Williams*, No. W2008-02730-CCA-R3-CD, 2010 WL 1172206, at *4 (Tenn. Crim. App. March 26, 2010), *perm. app. denied* (Tenn. Sept. 2, 2010). This Court also has held that two convictions for felony evading arrest under both the "intentionally flee" and "attempt to elude" portions of the statute violated double jeopardy as those portions merely "reflected alternate ways of charging the same offense." *William Keith Paulson*, 2005 WL 1307800, at *7. However, we first note that each of those cases were decided prior to our supreme court's decisions in *Watkins* and *Glover P. Smith*. Furthermore, whether the act of fleeing multiple officers during a single continuing pursuit can support multiple convictions for felony evading arrest without violating principles of double jeopardy is an issue of first impression in this Court.

In examining the statute in question, we first must "determine if the statutory unit of prosecution has been expressly identified." *Glover P. Smith*, 2014 WL 2766674, at *12. The plain language of the evading arrest statute punishes the conduct of intentionally fleeing or attempting to elude "any law enforcement officer" after receiving a signal from *that specific officer* to bring the vehicle to a stop. T.C.A. § 39-16-603(b)(1)

-11-

("It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from *the officer* to bring the vehicle to a stop.") (emphasis added). Therefore, we note initially that the unit of conduct prohibited by the statute appears to be specific to an individual officer, rather than to law enforcement as a class.[4] Indeed, this Court has held that "[t]he evil at which the statute is directed is . . . to discourage flight from a police officer performing his or her official duties." *Prentice C. Calloway*, 2005 WL 1307800, at *8. However, it is not clear from the plain language of the statute that the legislature intended for there to be multiple instances of prosecutable conduct each time an additional officer joins a continuing pursuit. Although the defendant in such an instance may be evading multiple *officers*, he is only evading one *arrest*: his own. Indeed, while the language of the statute proscribes the conduct of fleeing an officer, the title of the statute is "evading arrest."[5]

We further note that, while the plain language of section (b)(1) of the evading arrest statute proscribes only the conduct of fleeing or attempting to elude by motor vehicle any law enforcement officer after having received a signal from that officer to stop, section (b)(2) states, "It is a defense to prosecution under this subsection (b) that the attempted arrest was unlawful." T.C.A. § 39-16-603(b)(2). Thus, the language of subsection (b)(2) suggests that the statute is aimed at the flight from *arrest*, not merely the act of failing yield to an individual officer's signal to stop. Indeed, subsection (a) of the evading arrest statute, which incorporates the previous version of the statute[6] and applies to all forms of locomotion other than a motor vehicle, is also limited to situations in which the person "knows the officer is attempting to arrest the person," or where the individual "has been arrested." *Id.* § 39-16-603(a)(1)(A), (B).

Furthermore, nothing in our review of the legislative history provided specific guidance regarding the intended unit-of-prosecution. *See Glover P. Smith*, 2014 WL 2766674, at *12. However, the legislative history does reveal that the clear intent of subsection (b) was to enhance the penalty for evasion of arrest by means of motor

---

[4] Indeed, our "primary concern" in statutory interpretation is to carry out the intent of the legislature without "unduly expanding or restricting the language of the statute beyond the legislature's intended scope," and we must apply the plain meaning of statutory language which is "clear and unambiguous." *Glover P. Smith*, 2014 WL 2766674, at *6 (citations omitted).

[5] Although Tennessee Code Annotated section 1-3-109 directs that headings to statutes "should not be construed as part of the law," it is "permissible under widely held rules of statutory construction to consider a heading for legislative intent and purpose." *In Re Estate of Davis*, 308 S.W.3d 832, 839 (Tenn. 2010).

[6] *See* 1995 Tenn. Laws Pub. Ch. 467 (H.B. 808).

vehicle[7] rather than to alter the overall gravamen of the crime of evading arrest in general.[8]  Indeed, during the introduction of the bill on the House Floor, Representative Edith Langster explained that the policy justification underlying subsection (b)(1) was to impose a felony sentence on those who would "[i]ntentionally tr[y] to get away from police officers for the crime they have been suspected of committing," in light of the great risk created to law enforcement and the public by a motor-vehicle pursuit.  H. Floor Deb. on H.B. 808, 99th Gen. Assemb. (Tenn. May 15, 1995) (statement of Rep. Edith Langster).  Therefore, the policy underlying the statute suggests that the statute is directed at the overall dangers inherent to flight by motor vehicle in general, rather than to the failure to yield to each individual officer involved in that pursuit.

As we have previously stated, where there is any ambiguity in defining the unit of prosecution intended by the legislature, we must apply the "rule of lenity," and that ambiguity must be decided against allowing multiple prosecutions.  *Watkins*, 362 S.W.3d at 543; *Glover P. Smith*, 2014 WL 2766674, at *12; *Lewis*, 958 S.W.2d at 739.  Based upon the analysis herein, we conclude that there is ambiguity in defining the unit of prosecution intended by the legislature in subsection (b).  Accordingly, we must apply the rule of lenity, and decide that ambiguity against allowing multiple prosecutions.  *See Watkins*, 362 S.W.3d at 543; *Glover P. Smith*, 2014 WL 2766674, at *12; *Lewis*, 958 S.W.2d at 739.  Therefore, we construe the unit of prosecution under Tennessee Code Annotated section 39-16-603(b)(1) to be the act of evading arrest, not the failure to yield to the signal to stop from each individual officer attempting that arrest.  Accordingly, we hold that one continuous pursuit of an offender evading arrest constitutes a single violation of the statute, regardless of the number of officers involved in the pursuit.

As previously stated, multiple panels of this Court have held that a single, uninterrupted pursuit constitutes one "continuous criminal episode" rather than discrete acts.  *William Keith Paulson*, 2005 WL 1307800, at *7; *Gregory Mullins*, 2005 WL 2045151, at *7 ("[T]he case giving rise to both offenses was one continuous criminal episode rather than two discrete acts capable of supporting multiple convictions."); *Prentice C. Calloway*, 2005 WL 1307800, at *7.  While the double jeopardy analysis in those cases does not apply directly to the unit of prosecution analysis herein, this Court's consideration of a police pursuit as one continuous criminal episode informs

_____

[7]During the introduction of House Bill 808 in the House Judiciary Committee, both Representative Edith Langster and Representative Bill Purcell explained that the purpose of the bill was to increase the statutorily prescribed sentence for evading arrest by motor vehicle.  Hearing on H.B. 808 Before the H. Judiciary Comm., 99th Gen. Assemb. (Tenn. Apr. 27, 1995) (statements of Rep. Edith Langster and Rep. Bill Purcell).

[8]*See, e.g., Anthony Jerome Carter v. State*, No. 10-12-00134-CR, 2014 WL 1681984, at *2 (Tex. App. Apr. 24, 2014) (reasoning that "the gravamen of 'evading arrest' is the evasion of an arrest," and concluding that "the allowable unit of prosecution for evading arrest is the evasion of arrest.").

our factual analysis of this case.

Here, Defendant was convicted on count four and count six of the indictment, both charging felony evading arrest. Count four of the indictment charged Defendant with evading Lieutenant Cornett, and count six of the indictment charged Defendant with evading Captain Markland. Captain Markland testified that she first encountered Defendant as he approached her in the Jeep traveling in the opposite direction on a two-lane road. When she activated her blue lights, Defendant did not stop and instead intentionally swerved the Jeep toward her, running her off the road. Defendant continued to flee in the Jeep. Lieutenant Cornett, on the other hand, joined the pursuit as it already was in progress. Captain Markland was forced to terminate her pursuit of Defendant after eleven miles, less than half of the overall pursuit which spanned a total of twenty-five miles. For the remainder of the pursuit, Lieutenant Cornett took the lead and eventually executed the "pit maneuver" which ended the pursuit and resulted in Defendant's arrest.

Based upon our factual analysis, we conclude that Defendant's continuous flight from the collective pursuit of multiple officers, which Lieutenant Cornett joined already in progress, was one continuous criminal episode constituting a single violation of Tennessee Code Annotated section 39-16-603(b)(1). Therefore we hold that Defendant's convictions for two counts of felony evading arrest are multiplicitous and constituted double jeopardy. Accordingly, we merge Defendant's two convictions for felony evading into a single conviction and remand to the trial court for the correction of the judgment orders to reflect the merger of the convictions.

*III. Sufficiency of the Evidence*

Defendant also contends that the State's evidence was insufficient to support his conviction for aggravated robbery and both of his convictions for aggravated assault. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences

which may be drawn therefrom." *Id.* (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. *Id.*

### A. Aggravated Robbery

Defendant asserts that the evidence was insufficient to support his conviction for aggravated robbery because he "took nothing from the person of the victim." According to Defendant, his taking of the Jeep constituted theft, not robbery.

Tennessee Code Annotated section 39-13-401(a) (2010) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." A defendant commits aggravated robbery as charged in the instant case when a robbery is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1) (2010). This Court consistently has held that the "taking from the person" element of the robbery statute "may be satisfied by a showing that the items were taken from the person of the victim or were taken in the victim's presence." *State v. Howard*, 693 S.W.2d 365, 368 (Tenn. Crim. App. 1985) (citing *Jones v. State*, 383 S.W.2d 20 (Tenn. 1964)); *State v. Miller*, 608 S.W.2d 158 (Tenn. Crim. App. 1980)). That is, "[i]t is well settled that the taking from the person may be either actual or constructive. It is actual when the taking is immediately from the person and constructive when in the possession of the victim or in the victim's presence." *Miller*, 608 S.W.2d at 160.

In this case, Hicks testified that Defendant approached him in his yard and, brandishing a knife, demanded that Hicks turn over his car keys. Officer Taylor also testified that he saw Defendant "swinging" a knife at Hicks before getting into the Jeep and driving away. Hicks testified that the Jeep was parked in his driveway with the keys in the ignition. Defendant's, Hicks's, and Officer Taylor's testimony all established that Defendant took the Jeep with the keys in the ignition while both were in Hicks's immediate presence. The fact that Defendant took the Jeep with the keys in the ignition in the presence of Hicks after threatening Hicks with a knife and demanding that Hicks turn over the keys was sufficient to establish the "taking from the person" element of aggravated robbery. Therefore, the evidence was sufficient to convince a reasonable trier of fact that Defendant committed aggravated robbery through the display of a deadly weapon. Accordingly, Defendant is entitled to no relief on this basis.

## B. Aggravated Assault

Defendant was convicted of two counts of aggravated assault with a deadly weapon: one for swerving into Captain Markland's lane of traffic, charged in count seven of the indictment; and one for reversing his vehicle into Lieutenant Cornett's patrol car, charged in count five of the indictment. Defendant asserts that the evidence was insufficient to support both convictions, arguing that the evidence did "not support the conclusion that [Defendant] intended to cause death or serious bodily injury."

One commits the offense of aggravated assault with a deadly weapon who intentionally or knowingly "causes another to reasonably fear imminent bodily injury" involving the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(B) (2010). "[A] person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a) (2010). "[A] person who acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). Furthermore, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* A "deadly weapon" includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B) (2010).[9] "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2).

We also note the general rule that "criminal offense[s] may be established exclusively by circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 393 (Tenn. 1999). Furthermore, this Court has held that, in considering assault offenses, "a victim's fear may be inferred from the circumstances surrounding the offense, even though the victim did not testify about being afraid." *State v. Larry Allen Whited*, No. M2005-00167-CCA-R3-CD, 2006 WL 548228, at *11 (Tenn. Crim. App. March 7, 2006), *perm. app. denied* (Tenn. Aug. 28, 2006); *see also State v. Jamie Jon Schrantz*, No. W2002-01507-CCA-R3-CD, 2003 WL 22888910, at *3 (Tenn. Crim. App. Dec. 2, 2003) (although victim denied that she was afraid of Defendant, the evidence of "circumstances that suggest[ed] the victim experienced fear" was "sufficient to justify the jury in inferring that the victim reasonably feared imminent bodily injury"); *State v. Harry Jamieson*, No. W2003-02666-CCA-R3-CD, 2004 WL 2996910, at *8 (Tenn. Crim. App. Dec. 23, 2004) (although the victims did not testify at trial, the evidence was

---

[9]This Court has held that a motor vehicle can constitute a "deadly weapon" within the meaning of the statute. *State v. Tate*, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995); *State v. Leslie A. Pryor*, No. M2005-01429-CCA-R3-CD, 2006 WL 2563438, at *6 (Tenn. Crim. App. Aug. 31, 2006) ("[A] motor vehicle can be a "deadly weapon" for purposes of committing an aggravated assault.").

sufficient to allow the jury to infer that the victims reasonably feared imminent bodily injury); *State v. Jessie James Austin*, No. W 2001-00120-CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002) (although the victim did not testify at trial, "[a] victim's fear of imminent bodily injury may be proven with circumstantial evidence").  That is, "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." *State v. Gregory Whitfield*, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998), *perm. app. denied* (Tenn. Dec. 7, 1998).

Captain Markland testified that, as she was driving to join the pursuit of Defendant, she spotted the white Jeep traveling toward her in the opposite lane on a two-lane road.  She activated her blue lights as Defendant was approaching her in the Jeep.  She testified that, as she began to slow to a stop, the white Jeep "appeared to accelerate and travel into [her] lane of travel."  As a result, she was forced to drive off of the road in order to "avoid a head-on collision."  A video of the incident recorded from Captain Markland's patrol car was admitted into evidence without objection.  While Defendant testified that he never saw Captain Markland, the jury clearly chose to discredit the testimony of Defendant and accredit that of Captain Markland.  We may not reassess the credibility of either witness, and all conflicts in the testimony are resolved in favor of the State.  *Harris*, 839 S.W.2d at 75.  This evidence was sufficient to establish that, by swerving his car towards her and forcing her off the road, Defendant either intentionally caused Captain Markland to reasonably fear imminent bodily injury or was aware that such an action would cause her to reasonably fear imminent bodily injury.  Through her testimony that she had to make an evasive maneuver to avoid a near head-on collision, the jury could infer that Captain Markland reasonably feared imminent bodily injury.  Therefore, the evidence was sufficient to lead a reasonable trier of fact to find Defendant guilty of the aggravated assault with a deadly weapon of Captain Markland.  Accordingly, Defendant is not entitled to relief on this basis.

Lieutenant Cornett testified that she joined the pursuit of Defendant as it was already in progress.  At one point during the pursuit, Defendant "stopped in front of [her]," causing her to come to a stop as well.  She testified that Defendant then "put his vehicle in reverse and rammed into [her] vehicle."  A video recorded from Lieutenant Cornett's patrol car showing the collision was admitted into evidence without objection.  Defendant admitted to intentionally ramming Lieutenant Cornett's vehicle and explained, "I had this idea that I thought that if I backed into the cruiser that it would deploy the airbags and that that cruiser would no longer be able to follow me."  This evidence was sufficient to establish that, by ramming her car with the intent to deploy the airbags, Defendant either intentionally caused Lieutenant Cornett to reasonably fear imminent bodily injury or was aware that such an action would cause her to reasonably fear imminent bodily injury.  The jury could also infer from this evidence that, at the time

Defendant rammed her with his vehicle, Lieutenant Cornett reasonably feared imminent bodily injury.  Therefore, the evidence was sufficient to lead a reasonable trier of fact to find Defendant guilty of the aggravated assault with a deadly weapon of Lieutenant Cornett.  Accordingly, Defendant is not entitled to relief on this basis.

*IV. Sentencing*

Finally, Defendant asserts that he was improperly sentenced as a career offender based, in part, on offenses he committed as a juvenile.  In support of this argument, Defendant cites to the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551, 578 (2005), which held that the Eighth and Fourteenth Amendments to the United States Constitution prohibit the imposition of the death penalty on a juvenile offender.  While he acknowledges that "such is not the law," Defendant argues that "the same reasoning that prohibits imposition of the death penalty on individuals under the age of eighteen applies with equal force to the later use for enhancement purposes of convictions for crimes committed by the individual prior to his eighteenth birthday."

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.  Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result.  *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).  The party appealing the sentence has the burden of demonstrating its impropriety.  T.C.A. § 40-35-401 (2010), Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A defendant qualifies as a career offender if that defendant has received any combination of six or more Class A, B, or C felony convictions prior to the offense for which the defendant is being sentenced and if the offense for which the defendant is being sentenced is also a Class A, B, or C felony.  T.C.A. § 40-35-108(a)(1) (2010).  Prior convictions under the career offender statute include felony offenses committed by a defendant as a juvenile as long as the defendant was convicted of those felony offenses in criminal court.  *Id.* § 40-35-108(b)(3)(A).

At the sentencing hearing, the State entered into evidence certified copies of Defendant's prior felony convictions showing ten prior convictions for aggravated burglary, a Class C felony, and one prior conviction for theft over $10,000, also a Class C felony.  *See* T.C.A. § 39-14-403(b) and -105(4).  Defendant turned eighteen on June

12, 2000. Five of Defendant's prior felony convictions were committed in 2001, after he turned eighteen. Six of Defendant's prior felony convictions were committed between February 2000 and May 2000, before he turned eighteen. However, each of those offenses committed prior to Defendant's eighteenth birthday resulted in convictions in criminal court. Based on those convictions, Defendant clearly meets the statutory definition of a career offender. *See id.* § 40-35-108(a)(1). Although Defendant asserts that "the same reasoning that prohibits imposition of the death penalty on individuals under the age of eighteen applies with equal force to the later use for enhancement purposes of convictions for crimes committed by the individual prior to his eighteenth birthday," he provides no argument and cites us to no authority in support of that assertion. Therefore, we decline Defendant's invitation to extend the holding of *Roper*, prohibiting imposition of the death penalty on juvenile offenders, to the sentencing considerations in the instant case. Therefore, the trial court did not err when it sentenced Defendant as a career offender. Accordingly, Defendant is not entitled to relief on this issue.

As a final matter, we note that Defendant's convictions for aggravated assault in counts five and seven were combined onto a single uniform judgment order. We remand to the trial court to amend the judgment orders so that each conviction is contained on a single judgment order. *See* Tenn. Sup. Ct. R. 17 ("The judgment should be prepared for each conviction; if there are multiple convictions in the same indictment, separate judgments should be filled out.").[10]

*CONCLUSION*

For the reasons set forth above, we reverse Defendant's conviction for felony reckless endangerment and merge Defendant's two convictions for felony evading arrest into a single conviction. We remand this case to the trial court for further proceedings consistent with this opinion. We affirm the remaining judgments of the trial court.

_____
TIMOTHY L. EASTER, SPECIAL JUDGE

---

[10]In our review of the record, we also noted that the verdict forms for the Defendant's aggravated assault conviction pertaining to Captain Markland and the Defendant's reckless endangerment conviction contained erroneous count numbers. However, "our supreme court has specifically stated that failure to raise a contemporaneous objection to errors involving the verdict form results in waiver of the issue." *State v. Joseph H. Adkins*, No. E2012-02415-CCA-R3-CD, 2014 WL 1516331, at *13 (Tenn. Crim. App. Apr. 17, 2014) (citing *State v. Davidson*, 121 S.W.3d 600, 618 N. 11 (Tenn. 2003)). Therefore, this issue is waived.